IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KAREN GINTHER, | ) | |
| | ) | Judge Terrence F. McVerry |
| Plaintiff, | ) | Magistrate Judge Lisa Lenihan |
| v. | ) | 2:09-cv-921 |
| | ) | Doc. Nos. 10, 11 |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPORT AND RECOMMENDATION**

**I.      Recommendation**

Plaintiff, Karen Ginther, brought this action pursuant to 42 U.S.C. § 405(g) and §1383(c)(3) for judicial review of the final determination of the Commissioner of Social Security ("Commissioner") which denied her application for disability insurance benefits ("DIB') and supplemental security income ("SSI") under titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. Plaintiff filed a motion for summary judgment (Doc. No. 10) and brief in support (Doc. No. 11) on November 30, 2009. The Commissioner filed a cross-motion for summary judgment (Doc. No. 12), and brief in support (Doc. No. 13) on December 28, 2009. Plaintiff filed a reply brief (Doc. No. 14) on January 7, 2010. For the following reasons, it is respectfully recommended that the Commissioner's motion for summary judgment be granted. It is further recommended that Plaintiff's motion for summary judgment be denied.

**II.      Report**

Plaintiff protectively filed for SSI and DIB on November 14, 2005 alleging disability due to post-concussion and chronic back pain with an alleged onset of disability of April 14, 2005. (R. 57, 478). Her claim was denied at the state agency level on June 14, 2006. (R. 32-33). Plaintiff filed a request for a hearing before an administrative law judge ("ALJ") on August 10, 2006. (R. 42). A hearing was held before ALJ James Bukes on November 7, 2007 (R. 481-512). Plaintiff, who was represented by counsel, appeared at the hearing and testified on her own behalf. (R. 482-506). An impartial vocational expert also testified. (R. 506-511). The ALJ issued a decision on February 27, 2008, finding that Plaintiff was not disabled within the meaning of the Act. (R. 15-26). The Appeals Council subsequently denied Plaintiff's request for review, thereby making the decision of the Commissioner final in this case. (R. 5-7). Plaintiff now seeks review of that decision by this Court.

**A.      Facts**

Plaintiff was forty-seven years old at the time of the hearing, and therefore was defined as a "younger individual," age 18-49, pursuant to 20 C.F.R. §§ 404.1563, 416.963. (R. 483). Plaintiff has a high school education, is married, and has a son. (R. 482-483). Plaintiff's prior work includes employment as a lead technician at a hospital, an operating room technician, and a sterile processing technician. (R. 483-485). Plaintiff was involved in a car accident on April 14, 2005, and did not return to work following the accident. (R. 487).

From 1999 through 2003, Plaintiff treated with Dr. Robert Kaniecki, a neurologist, for migraine headaches. (R. 470). These symptoms were managed with calcium channel blockers and Darvocet/Reglan on an as needed basis. *Id*. Following her accident, on April 22,

2

2005, Plaintiff began treating with Richard Rafferty, D.C., a chiropractor. (R. 232-33). Plaintiff reported her symptoms as frontal headaches and pain in her back, neck, ribs, right shoulder, eyes, right hip, right leg, right foot, right hand, right wrist, and right fingers. *Id*.  She suggested that these symptoms precluded her from carrying out her daily activities. *Id*. Mr. Rafferty performed orthopaedic tests and concluded that Kemp's Test was positive on the right side, the Cervical Distraction Test was positive bilaterally, the Jackson Compression test was positive bilaterally, the Maximum Cervical Compression test was positive bilaterally, the Should Depression test was positive on the right side, Goldthwait's sign was present on the right side, straight leg raises were positive, Patrick's test was positive on the right side, Gaenslen's test was positive on the right side, and Lewin-Gaenslen's test was positive on the right side. (R. 233-234).  X-rays revealed moderate intervertebral disc space narrowing at L5/S1, marked disc space narrowing at L5/S1, extreme subluxation at C1/C2, marked subluxation at T5/T6, extreme subluxation at L5/S1, extreme misalignment at T1/T2, early at the vertebral margin at C5/C6, moderate osteophytosis at L4/L5, and marked impingement at L4/L5. (R. 234). Mr. Rafferty concluded that Plaintiff was totally disabled, but that the condition should be temporary. (R. 235).

       Plaintiff continued to treat with Mr. Rafferty several times a week through December 2005. (R. 102-231). Through the course of her treatment, Plaintiff reported some slight improvement in her headaches and pain. *Id*. At her final appointment on December 8, 2005, Mr. Rafferty again opined that Plaintiff remained temporarily disabled. (R. 102).

       On May 20, 2005, Plaintiff was examined at the emergency room by Dr. Marcus Eubanks. (R. 98). Plaintiff reported "vague diffuse headaches" and being "somewhat unsteady

on her feet" with dizziness. *Id*. On examination, Plaintiff was neurologically nonfocal, had a steady and normal gait, and manifested no pronator drift. A CAT scan of the brain was normal, and Dr. Eubanks noted that there was nothing to suggest neurological conditions stemming from her car crash. (R. 99-100).

Plaintiff was examined on May 23, 2005 by Dr. Robert Grieco, a family practitioner. (R. 285). Plaintiff reported difficulties stemming from "whiplash" suffered during the accident including vertigo, neck pain, and migraine headaches. *Id*. Dr. Grieco noted that she was not exhibiting significant symptoms and that it seemed as if "things had cleared." *Id*. Plaintiff was continued on Darvocet for headaches, but requested additional pain medication for her neck. *Id*. She was prescribed Ativan for recurrent symptoms, meclizine to take as needed, and Percocet for bad pain. *Id*. On June 6, 2006, Plaintiff returned to Dr. Grieco with continued complaints of vertigo and migraines as well as difficulty sleeping, right shoulder pain, and right upper extremity numbness. (R. 284). Upon examination, strength was good in the right arm and hand, her right shoulder was tender and a little weak and was very tender in the rotator cuff, and range of motion was fairly normal. *Id*. Dr. Grieco ordered an EMG and nerve conduction studies, physical therapy, and started Restoril for sleep and vertigo. *Id*.

On July 11, 2005, Plaintiff was again examined by Dr. Grieco with complaints of pain in her right arm and shoulder and a cough. (R. 282). Dr. Grieco indicated that he concurred with Plaintiff's physical therapist in his opinion that Plaintiff should attend an occupational therapy program and work hardening program, which would delay her return to work by a month. *Id*. On examination, Plaintiff's range of motion was "pretty good" and she was able to ambulate "okay." *Id*.

4

Plaintiff was next evaluated by Dr. Thomas Franz, a physiatrist, on July 14, 2005. (R. 314-316). Plaintiff reported vertigo and migraine headaches, but also stated that these difficulties had decreased with chiropractic treatment. (R. 314). On examination, Dr. Franz noted that Plaintiff was obese, was alert and oriented in three spheres; had fluent speech; had signs of one abnormal cranial nerve; restricted rotation of the head to the left; increased spasm of the cervical paraspinals and upper trapezius; relative shoulder elevation on the right; 4/5 strength in her deltoids, biceps, triceps, latissimus dorsi, wrist flexors and extensors, grip, ilioposas, quadriceps, hamstrings, plantar, and dorsifexors; tenderness over the right greater trochanter; 1+ and symmetrical muscle stretch reflexes; and flexor plantar responses. (R. 315). Plaintiff's gait was noted as a compensated Trendelenburg gait to the right side. *Id*. Dr. Franz diagnosed cervicalgia with vestibulopathy related to her motor vehicle accident and secondary gait deviation due to greater trochanteric bursitis. *Id*. Dr. Franz recommended myofascial release and trigger point therapy to the upper trapezius with a strengthening program and balance challenging exercises. *Id*. Dr. Franz noted that Plaintiff's post-vestibular concussion symptoms were clearing well and that her migraines were decreasing in frequency and returning to baseline. (R. 315-316). He also noted that she had no significant head injury related to the accident. (R. 316).

Plaintiff returned to Dr. Grieco on August 11, 2005 with continuing complaints of neck pain radiating down her shoulder and migraines with episodes where she felt like she was suddenly falling asleep. (R. 282). Plaintiff reported that her migraines had increased to almost every day. *Id*. Dr. Grieco also noted that Plaintiff was diabetic. *Id*. On examination, Plaintiff was alert and oriented with tenderness on her right side and right trapezius muscles. *Id*. He

noted that he believed her migraines were related to sleep deprivation and recommended that she continue with chiropractic care, massage therapy, physiatry, and physical therapy. *Id*. He also recommended Byetta therapy for her diabetes and prescribed Depakote. *Id*. Plaintiff was started on Byetta on August 16, 2005. (R. 281). Plaintiff had a follow-up appointment with Dr. Grieco on October 14, 2005, at which time Dr. Grieco noted that Plaintiff remained disabled due to complications from her motor vehicle accident. (R. 279). He also reported that Plaintiff was tolerating Byetta and the dosage was increased. *Id*. Plaintiff's asthma was noted as stable on Advair, and she was continued on Zantac for reflux, Restoril for sleep, Ativan for anxiety and headaches, and Percocet for pain. *Id*. Dr. Grieco indicated that physical and massage therapies were making very slow progress. *Id*. She was continued on her treatments. *Id*.

Plaintiff had a follow-up with Dr. Franz on August 26, 2005 for a trigger point injection in her right shoulder. On November 7, 2005, Dr. Franz filled out a check-box employability assessment form indicating that Plaintiff was disabled starting on April 27, 2005 and would continued to be disabled until January 1, 2007 due to post-concussion, chronic back pain, migraine, and fibromyalgia. (R. 307). Plaintiff returned to Dr. Franz on January 6, 2006 for continued problems with migraines, shoulder pain, and myofascial pain with spasms. (R. 299). Dr. Franz indicated that Plaintiff was suffering from "possible partial complex seizures" and she was prescribed Lamictal. *Id*. She was also ordered a TENS unit for home use. *Id*.

Plaintiff returned to Dr. Grieco on January 24, 2006 for complaints of mood disorder, fibromyalgia, diabetes, and chronic pain. (R. 278). Plaintiff described stop-stare attacks and asked questions regarding her seizure disorder, which were referred to her physiatrist. *Id*. Plaintiff was continued on Lamictal for her fibromyalgia, seizures, headaches,

and depression. *Id*. Dr. Grieco noted that Plaintiff had some resolution of stress and had an improved mood. *Id*. On examination, Plaintiff refused to have her weight taken but her weight was noted as "still going up"; her back was noted as "very tender"; and range of motion was decreased. *Id*. Plaintiff was assessed with probable seizure disorder, mood disorder not otherwise specified, basilar migraines, and diabetes, poorly controlled. *Id*.

On February 27, 2006, Plaintiff underwent a consultative psychological examination with Dr. Julie Uran. (R. 290-293). Plaintiff reported that she was doing well. (R. 291). On examination, Plaintiff ambulated with a limp, exhibited spontaneous and coherent speech, exhibited situationally appropriate mood and affect, displayed no evidence of disturbance of thought process or neural sensory distortions, displayed normal and relevant thought processes with coherent language, tested with average intelligence, relied on adequate memory, evidenced difficulties with impulse control through eating, and displayed good insight and judgment. (R. 292-293). Plaintiff was diagnosed with adjustment disorder with mixed anxiety and depressed mood and rule-out cognitive disorder, not otherwise specified with a GAF of 65.[1] (R. 293). Dr. Uran opined that Plaintiff would have slight limitations in understanding,

---

[1] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. A GAF score of between 61-70 denotes "some mild symptoms." The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation . . . .)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood; of 30 may have behavior "considerably influenced by
(continued...)

remembering and carrying out detailed instructions and responding appropriately to work pressures in a usual work setting. (R. 296). Dr. Uran further noted that Plaintiff's problems "involved physical rather than emotional health." (R. 297).

On March 10, 2006, Plaintiff returned to Dr. Franz for a follow-up due to migraine, seizure disorder, myofascial pain, and post-concussion syndrome. (R. 303). Plaintiff reported seizures where she would black out for a minute and lose time. (R. 304). Dr. Franz ordered a resumption of Depakote, an EEG, the continued use of the TENS vest, and therapeutic aquatics. (R. 303). A review of systems was normal except for reports of difficulty sleeping. (R. 304). An MRI performed on March 21, 2006 revealed a right rotator cuff tear. (R. 434).

Plaintiff's records were reviewed by a state agency psychiatrist, Dr. Richard Heil, on April 5, 2006. (R. 317-320). Dr. Heil opined that Plaintiff was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length or of rest periods and in the ability to set realistic goals or make plans independent of others. (R. 318). He also opined that she was mildly limited in her activities of daily living; mildly limited in maintaining social functioning; moderately limited in maintaining concentration, persistence, or pace; and experienced no episodes of decompensation. (R. 331). On June 12, 2006, Dr. Reynaldo Torio, a state agency physician, reviewed Plaintiff's medical records and opined that Plaintiff could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds;

---

[1](...continued)
delusions or hallucinations" or "serious impairment in communication or judgment (e.g., . . . suicidal preoccupation)" or "inability to function in almost all areas . . .; of 20 "[s]ome danger of hurting self or others . . . or occasionally fails to maintain minimal personal hygiene . . . or gross impairment in communication . . . ." *Id.*

stand and walk about six hours in an eight hour work day; sit about six hours in an eight hour work day; and was unlimited in her ability to push and pull. (R. 335-339).

On May 10, 2006, Plaintiff returned to Dr. Franz for treatment of her post-concussion syndrome and migraine headaches. (R. 394). She reported that she was maintaining sleep and strength testing was 5/5 on both the right and left. (R. 395-396). Plaintiff had an additional follow-up on June 30, 2006. (R. 390-393). Dr. Franz noted that therapy "had noted some but not great improvement" in pain and range of motion. (R. 391). Plaintiff reported pain in her shoulder and uncontrolled movement, but also noted that she was having "significantly fewer" staring spells. *Id*. A review of systems was normal. *Id*. Dr. Franz reported that Plaintiff's range of motion was reduced in her cervical spine, thoracolumbar spine, and shoulder and that these areas were tender to palpitation. (R. 393).

On June 14, 2006, Plaintiff was re-evaluated at the Headache Center by Dr. Robert Kaniecki. (R. 470). Dr. Kaniecki detailed Plaintiff's successful treatment from 1999-2003 with calcium channel blockers and Darvocet/Reglan as needed. *Id*. He noted her accident in 2005, but also indicated that her headaches had returned to their baseline frequency since that date with eight headaches a month, four of which were severe. *Id*. On examination, Plaintiff exhibited fluent speech and normal language; steady station; slightly wide-based, jerky but functional gait; normal nerve testing; and normal muscle tone, mass, and strength. (R. 471). Dr. Kaniecki concluded that Plaintiff's headaches were relatively stable and had improved over the prior year. *Id*. He also noted that Plaintiff's neurological examination was completely functional and that many of her symptoms were likely related to a conversion disorder, defined as physical and neurological symptoms caused by psychological difficulties, and brought on by

stress. *Id*. He recommended Ativan with the continuation of rehabilitation programs, and in the event of a failure to improve, a psychological evaluation. *Id*.

Plaintiff returned to Dr. Franz on August 25, 2006. (R. 387). Plaintiff reported an increase in her migraine headaches. *Id*. Dr. Franz reinforced the recommendations of Dr. Kaniecki on headache management, referred Plaintiff to an orthopedist, and refilled for Lamictal. *Id*. On November 1, 2006, Plaintiff underwent a right rotator cuff repair performed by Dr. Nicholas Kubik. (R. 382). Plaintiff had a follow-up with Dr. Franz on November 17, 2006 and it was noted that her rotator cuff repair was healing well. (R. 382). Plaintiff reported some continuing difficulties with perception and balance as well as night driving. *Id*. She also noted that she was not experiencing as many migraine headaches. (R. 385). Dr. Franz recommended that Plaintiff refrain from driving at night. *Id*.

Plaintiff's next follow-up with Dr. Franz occurred on January 10, 2007. (R. 378-380). Plaintiff reported continued difficulty driving at night and dizziness when moving her neck to the left. (R. 378). The record indicated that Plaintiff had been placed on a BiPAP for sleep apnea by another physician. (R. 397). Her migraine medications had also been changed due to difficulty "getting out of migraines." (R. 378).

On April 13, 2007, Plaintiff was examined by Dr. Kubik. (R. 362). Plaintiff reported that she was doing "ok." *Id*. On examination, Dr. Kubik noted that Plaintiff had full range of motion, but her strength was 4/5. *Id*. He recommended that she continue her home exercise program. *Id*. Plaintiff returned to Dr. Kubik on June 8, 2007 and continued to report some difficulty. (R. 361). Further testing was ordered. *Id*. Later review of that testing revealed no significant pathology. (R. 360).

Plaintiff returned to Dr. Franz on July 5, 2007 with complaints of blurred vision, headaches, and "feeling spacey." (R. 374). She noted that she was experiencing a migraine while in his office. *Id*. On examination, Dr. Franz noted that her speech was slow and slurred and that she had tenderness over her neck and back. (R. 375-376). On August 17, 2007, Plaintiff was examined by Dr. Kaniecki and reported that she was experiencing ten to twelve migraine headaches a month, six of which were severe. (R. 466). Effexor was added as a medication for migraine treatment. *Id*.

On August 23, 2007, Dr. Franz composed a letter to Plaintiff's counsel describing her course of treatment. (R. 340-343). Dr. Franz opined that Plaintiff would be limited to a sedentary job with no overhead lifting and could possibly be precluded from competitive work due to the frequency of her migraines and time lost at work. (R. 342). Plaintiff's final record from Dr. Franz was dated November 15, 2007. (R. 364). Plaintiff reported that her headaches were unchanged. *Id*. Dr. Franz continued her various treatments. *Id*.

Plaintiff returned to Dr. Kubik on August 30, 2007 and her cervical MRI was reviewed. (R. 359). The MRI showed degenerative changes in the cervical spine as well as some uncontrovertebral spurring at 3-4. *Id*. Disc bulges were also noted at C5-6 and 6-7 with some indentation of the cord at C5-6. *Id*. On September 12, 2007, Plaintiff was referred by Dr. Kubik to Dr. Duke Thomas for her spinal difficulties. (R. 357-358). An MRI of Plaintiff's neck showed some degenerative disc disease, but no disc herniation. (R. 358). EMG studies were also normal. (R. 357). Dr. Thomas referred Plaintiff to a pain management specialist. *Id*.

    **B.**    **<u>Hearing Testimony and ALJ's Opinion</u>**

On November 27, 2007, Plaintiff, who was represented by counsel, testified at the hearing before ALJ Bukes. Plaintiff testified that she is married and lives with her husband and fourteen year old son. (R. 483). She was employed as a lead technician in a hospital from 1991 to 1993, a sterile processing technician from 2001-2006, and a operating room support technician from 1999-2001. (R. 483-485). Plaintiff testified that she had been receiving long-term disability from her employer and relying on her husband's social security disability benefits. (R. 487-488). Plaintiff described the details of her accident in April 2005. *Id*.

Regarding her physical difficulties, Plaintiff testified that she had sleep apnea and treated with a CPAP machine, diabetes treated with insulin, right rotator cuff repair, neck pain treated with Darvocet, fibromyalgia, and migraine headaches treated with Effexor, Topamax, and Lamictal. (R. 488-499, 502). Plaintiff indicated that her migraines were occurring daily, with severe ones occurring twice a week. (R. 491, 503). She also noted episodes of "spaciness" and staring spells. (R. 494). She testified to using a cane. *Id.*

At the time of the hearing, Plaintiff noted that she could drive short distances to the store to get food for dinner. (R. 495). She also noted, that on a good day, she could do laundry and cooking, but was limited by headaches and associated vomiting and diarrhea. *Id*. Plaintiff indicated that she occasionally exercised on a treadmill and used exercise balls as suggested by her physical therapist. (R. 496-497).

On February 27, 2008, the ALJ rendered a decision which was unfavorable to Plaintiff under the five-step sequential analysis used to determine disability. (R. 15-25). At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since April 14, 2005. (R. 17). At step two, the ALJ found that Plaintiff had the following severe

impairments: post-concussive syndrome; myofascial pain syndrome; headaches, and vertigo; degenerative disc disease from C3-C7 and disc bulges of the cervical spine; and status post-rotator cuff repairs of the right shoulder, diabetes mellitus, type II; sleep apnea; obesity; and depression. (R. 17). At step three, the ALJ concluded that Plaintiff's impairments did not meet or equal one of the listed impairments set forth in 20 C.F.R. 404 Subpart P, App. 1. *Id*. At step four, the ALJ determined that Plaintiff was unable to return to any past relevant work. (R. 24.) At step five, the ALJ concluded that the government had met its burden to show that Plaintiff had the residual functional capacity to perform sedentary work with a sit/stand option as needed through the work day. (R. 19). He also stipulated that she could perform no crawling, kneeling, and overhead lifting and needed to avoid temperatures extremes and hazards such as heights and moving machinery. *Id*. Finally, he stated that she could do no more than simple tasks, must avoid crowds, and must avoid changes in the work setting. *Id*.

### C. Standard of Review

The Act limits judicial review of disability claims to the Commissioner's final decision. 42 U.S.C. § 405(g). If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed by the Court. 42 U.S.C. § 405(g); *Schaudeck v. Comm'n of Soc. Sec. Admin.,* 181 F.3d 429, 431 (3d Cir. 1999). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). It consists of more than a scintilla of evidence, but less than a preponderance. *Stunkard v. Secretary of Health & Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988).

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920 (1995). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work. *See* 42 U.S.C . § 404.1520; *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 118-19 (3d Cir. 2000) (*quoting Plummer v. Apfel*, 186, F.3d 422, 428 (3d Cir. 1999)).

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. § 423 (d)(1) (1982). This may be done in two ways:

> (1) by introducing medical evidence that the claimant is disabled *per se* because he or she suffers from one or more of a number of serious impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1. *See Heckler v. Campbell*, 461 U.S. 458 (1983); *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777; or,
>
> (2) in the event that claimant suffers from a less severe impairment, by demonstrating that he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first demonstrate the existence of a medically determinable disability that precludes plaintiff from returning to his or her former job. *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777. Once it is shown that claimant is unable to resume his or her previous employment, the burden shifts to

the Commissioner to prove that, given claimant's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Stunkard*, 842 F.2d at 59; *Kangas*, 823 F.2d at 777; *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986); *Rossi v. Califano*, 602 F.2d 55, 57 (3d Cir. 1979).

### D.     Discussion

Plaintiff makes two related arguments in her motion for summary judgment. First, she claims that the ALJ gave improper weight to the opinion of Plaintiff's treating physician Dr. Franz. Plaintiff contends that she suffers from debilitating migraines; a point she suggests is supported by Dr. Franz's opinion and the medical evidence of record. Plaintiff argues that the ALJ rejected Dr. Franz's opinion based on his own personal opinions rather than based on the evidence. Finally, Plaintiff argues that the aforementioned delinquencies led to an incomplete hypothetical question to the vocational expert and residual functional capacity. The Commissioner argues that Plaintiff has failed to prove that she is disabled and that the decision of the ALJ is, therefore, supported by substantial evidence.

*1. Treating Physician Doctrine*

Plaintiff argues that the ALJ gave improper weight to the opinion of Dr. Franz. Plaintiff contends that if the ALJ had properly followed the standard set forth in Third Circuit case law, he would not have relied on speculation and personal opinion in weighing Dr. Franz's opinion.

A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period

of time." *Morales v. Apfel*, 225 F.3d 422, 429 (3d. Cir. 1999), (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)). However, for controlling weight to be given to the opinion of a treating physician that opinion must be "well supported by medically acceptable clinical and laboratory diagnostic techniques and ... not inconsistent with other substantial evidence." 20 C.F.R. §§404.1527 (d)(2), 416.972 (d)(2). An ALJ may reject a treating physician's opinion outright on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided. *Newhouse v. Heckler,* 753 F.2d 283, 286 (3d Cir.1985). There are several factors that the ALJ may consider when determining what weight to give the opinion of the treating physician. 20 C.F.R. §404.1527, 416.927 (d)(2). They include the examining relationship, treating relationship (its length, frequency of examination, and its nature and extent), supportability by clinical and laboratory signs, consistency, specialization, and other factors. 20 C.F.R. §404.1527 (d), 416.927 (d).

Generally, an ALJ may not make speculative inferences from medical reports and is not free to employ his own expertise against that of a physician who presents competent medical evidence. *Fargnoli v. Massanari*, 247 F.3d 34, 37 (3d Cir. 2001). When a conflict in the evidence exists, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Mason v. Shalala,* 994 F.2d 1058, 1066 (3d Cir.1993). The ALJ must consider all the medical evidence and give some reason for discounting the evidence he rejects. *Stewart v. Secretary of H.E.W.,* 714 F.2d 287, 290 (3d Cir.1983).

Plaintiff concedes that her physical limitations allow her to perform at the sedentary work level, however, she contends that the ALJ erred specifically in disregarding the effect of

nonexertional limitations, specifically migraines, on her ability to work. (Plaintiff's Brief, Doc. No. 11, p. 6). In his opinion, the ALJ gave significant weight to Dr. Franz's opinion that Plaintiff was capable of sedentary work. (R. 23). He rejected Dr. Franz's opinion relating to Plaintiff's migraines, in part, because it was inconclusive. *Id.* Dr. Franz stated that Plaintiff's migraines "*may* preclude competitive employment due to the amount of time lost at work." (R. 342)(emphasis added). Dr. Franz also stated that Plaintiff's migraine difficulties were permanent, but also "manageable with ongoing treatment" in the form of medications. *Id.*

In addition to the inconclusive nature of Dr. Franz's opinion, the ALJ relied on the medical record suggesting that it did not "support[] the degree or severity of headaches alleged." (R. 23). Plaintiff contests this finding and suggests that her headaches were severe, disabling, and increasing in severity and frequency through her course of treatment. In support of his finding otherwise, the ALJ noted that a CAT scan of Plaintiff's brain in May 2005 showed no acute disease or neurological deficit. (R. 22, 99-100). The ALJ indicated that this report was supported by Dr. Franz's July 2005 assessment that Plaintiff had not suffered from any significant head injury in the accident and had a decreasing numbers of headaches that were returning to her pre-accident baseline. (R. 20, 23, 314-316). This finding was supported by Dr. Kaniecki's examination in June 2006 noting that Plaintiff's headaches had returned to baseline after the accident. (R. 23, 470). Dr. Kaniecki also opined that Plaintiff's headaches were relatively stable and that her neurological examination was "completely functional." (R. 23, 471). Dr. Kaniecki recommended continued treatment with medication. *Id.*

Notably, Dr. Franz reinforced the recommendations of Dr. Kaniecki in August 2005 and Plaintiff reported, in November 2006, that she was not experiencing as many migraine

headaches. (R. 23, 387, 382). While there was some evidence of medication changes in January 2007 and August 2007 with a slight increase in the number of headaches, Dr. Franz opined that Plaintiff's symptoms were manageable with medication. (R. 23, 378, 466, 342). Plaintiff reported that her headaches were unchanged in November 2007. (R. 346).

It is evident from the medical record and the inconclusive nature of Dr. Franz's opinion relating to the effect of Plaintiff's migraines on her ability to work, that it was appropriate for the ALJ to reject the statement that Plaintiff's migraines "may preclude competitive employment due to the amount of time lost at work." (R. 342). In addition, significant weight was given to the remainder of Dr. Franz's opinion that stated, with certainty, Plaintiff's work capacity, which was noted and accepted by Plaintiff in her brief. (R. 23). As a result, the ALJ's assignment of weight to Dr. Franz's opinion was supported by substantial evidence.

*2.     Residual Functional Capacity Assessment*

Plaintiff additionally argues that the ALJ erred in his determination of Plaintiff's residual functional capacity. Specifically, Plaintiff contends that the ALJ did not properly include limitations stemming from the frequency of her migraines. The Commissioner responded by arguing that the ALJ properly incorporated all of Plaintiff's functional limitations into his residual functional capacity assessment.

"'Residual functional capacity'[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett,* 220 F.3d at 121(quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)).  A claimant's RFC represents the most, not the least, that a person can do despite his or her limitations.  *See*

18

*Cooper v. Barnhart*, 2008 WL 2433194, at *2 n.4 (E.D.Pa., June 12, 2008) (citing 20 C.F.R. § 416.945(a)). In determining a person's RFC, an administrative law judge must consider all the evidence of record. 20 C.F.R. §§ 404.1520, 416.920. Although an administrative law judge can weigh the credibility of the evidence when making a RFC determination, he or she must give some indication of the evidence which is rejected and the reasons for doing so. *Id.* As the court stated in *Burnett*, "'[i]n the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Id.* at 121 (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).

In making his residual functional capacity determination, the ALJ considered the medical record, as discussed above, and the opinions of Plaintiff's physicians. In rejecting much of Plaintiff's testimony regarding her headaches, the ALJ relied most heavily on the fact that Plaintiff's headaches had returned to their pre-accident baseline and were manageable with medication. (R. 20, 23, 314-316, 470-471). There was no suggestion in the medical evidence to support Plaintiff's testimony that she was experiencing daily migraine headaches or recurrent nausea or diarrhea. (R. 491, 495, 503). As was discussed above, Plaintiff accepts the ALJ's conclusion that she was capable of sedentary work and the record supports a finding that her headaches were manageable. Therefore, the Court finds that the ALJ's residual functional capacity determination is supported by substantial evidence.

## III.     Conclusion

For the reasons stated above, it is recommended that the Motion for Summary Judgment filed by Plaintiff at Doc. No. 10 be denied. It is further recommended that the Motion for Summary Judgment filed by the Defendant at Doc. No. 12 be granted and that the decision

of the Commissioner to deny Plaintiff disability insurance benefits (DIB) and supplemental security income (SSI) be affirmed.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Dated: May 13, 2010

_____
Lisa Pupo Lenihan
United States Magistrate Judge

cc:     Counsel of record